SUN POWER, INC., Appellant,

v.

John ADAMS, d/b/a Adams Office Machines, Appellee.

No. 2–86–268–CV.

Court of Appeals of Texas, Fort Worth.

May 25, 1988.

Whitten, Loveless, Kelsey, Gregory, Holt & Phillips, Richard H. Kelsey, David D. Garcia, Denton, for appellant.

Virginia Nelson Hammerle, Lewisville, for appellee.

Before JOE SPURLOCK, II, KELTNER and LATTIMORE, JJ.

## OPINION

LATTIMORE, Justice.

This is an appeal from an action brought under the Deceptive Trade Practices–Consumer Protection Act ("DTPA"), arising out of a dispute pertaining to the sale of a cash register. The trial court, subsequent to the jury's answers to special issues, rendered judgment notwithstanding the verdict. Appellant appeals the take-nothing judgment rendered by the court.

Appellant raises four points of error, alleging the trial court erred in failing to render judgment in accordance with jury findings; and in rendering judgment for appellee who failed to affirmatively plead accord and satisfaction.

We reverse the judgment of the trial court and render.

By its first and second points of error, appellant contends that the trial court erred in failing to enter judgment for Sun Power, Inc. ("Sun Power") in accordance with the findings of the jury, in violation of TEX.R.CIV.P. 301. Specifically, appellant argues that the trial court should have accepted the jury findings to special issues numbers 5a, 5b, 5c, and 10, as follows:

### SPECIAL ISSUE NO. 5

(a) Do you find from a preponderance of the evidence that the action and course of action of JOHN ADAMS in connection with the sales and service of cash registers by ADAMS OFFICE MACHINES to SUN POWER, INC. has been unssscionable? [sic]

You are instructed in answering this issue that an action or course of action is "UNCONSCIONABLE" if it is to a person's detriment and

(a) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

(b) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

Answer by stating "We do" or "We do not".

WE, THE JURY, ANSWER: <u>WE DO</u>

If you have answered Subdivision (a) "We do" and only in that event, then you shall answer the following Subdivision—

(b) Do you find from a preponderance of the evidence that any such unconscionable conduct of JOHN ADAMS caused and produced any damages or adverse effects to SUN POWER, INC.?

Answer "Yes" or "No."

WE, THE JURY, ANSWER: <u>YES</u>

If you have answered Subdivision (b) "Yes" and only in that event, then answer the following Subdivision—

(c) What sum of money, if paid now in cash, would reasonably and fairly compensate SUN POWER, INC. for any such damages and adverse effects?

Answer by stating any sum you may so find in dollars and cents; otherwise, answer "None".

WE, THE JURY, ANSWER: <u>$700</u>

SPECIAL ISSUE NO. 10

If in one or more of Special Issues Nos. 1, 3, 4, and 5 of this Charge you have found that JOHN ADAMS, D/B/A ADAMS OFFICE MACHINES, acted (or failed to act) "KNOWINGLY," as that term has been defined to you and that his conduct in so doing caused in fact and produced any damages or adverse effects to SUN POWER, INC., then you shall answer the following question:

if any,

What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would, in your opinion, be sufficient and adequate as exemplary damages to punish the said JOHN ADAMS, D/B/A ADAMS OFFICE MACHINES, for making any false material representation, failing to make a disclosure of fact, or in fulfilling any express or implied warranty to SUN POWER, INC. which you have found in fact caused and produced any damages or adverse effects to Sun Power, Inc.?

By the term "EXEMPLARY DAMAGES," as used in this Special Issue is meant a sum of money awarded not to compensate an injured person for his actual loss or damage but to punish the wrongdoer for his conduct and to deter him and others from similar behavior.

You may answer this question in your discretion by stating a sum of money in dollars and cents or by stating "None".

WE, THE JURY, ANSWER: <u>$2,239.17</u>

Special issue number 5 pertains to section 17.50(a)(3) of the DTPA under which a consumer may maintain a cause of action where any unconscionable action or course of action constitutes a producing cause of actual damages. *See* TEX.BUS. & COM. CODE ANN. sec. 17.50(a)(3) (Vernon 1987). The Texas Supreme Court has clarified the three types of damages allowed in section 17.50(b)(1) under the 1979 amendment to the statute: the trier of fact may award actual damages; if actual damages are found, it is mandatory that *the court* award additional statutory damages by trebling that portion of the actual damages that does not exceed $1,000 in all DTPA cases; finally, the *trier of fact*, in its discretion, may award not more than three times the amount of actual damages in excess of $1,000 in cases in which the deceptive act or practice is found to have been committed knowingly, or alternatively, not award them at all. *See Jim Walter Homes, Inc. v. Valencia*, 690 S.W.2d 239, 241 (Tex.1985); *see also Martin v. McKee Realtors, Inc.*, 663 S.W.2d 446, 447 (Tex. 1984).

The jury awarded actual damages in special issue number 5, where they found the acts of appellee were unconscionable and the producing cause of appellant's damages, and assessed damages at $700. The jury further awarded exemplary damages of $2,239.17 in special issue number 10, allegedly premised upon a finding that appellee's wrongful conduct found in special issue number 5 was committed knowingly. Appellant requested the trial court enter a judgment on the jury findings in favor of

Sun Power, allowing appellant to recover from appellee actual damages as found by the jury, prejudgment interest at the rate of 10%, and additional statutory damages as provided for within the DTPA. The trial court instead disregarded the jury's findings, and granted appellee's motion for a judgment non obstante veredicto. Appellant argues that the trial court improperly disregarded the jury's findings in granting this judgment. We agree.

In order for an appellate court to sustain a trial court in granting a motion for judgment non obstante veredicto, it must be determined that there is no evidence upon which the jury could have made the finding relied upon. *Exxon Corp. v. Quinn*, 726 S.W.2d 17, 19 (Tex.1987); *Navarette v. Temple Independent Sch. Dist.*, 706 S.W.2d 308, 309 (Tex.1986). In making this determination of whether there is more than a scintilla of evidence upon which the jury could have made the finding, we must review the evidence in the light most favorable to the finding, considering only the evidence and inferences which support the finding and rejecting the evidence and inferences contrary to the finding. *See Williams v. Bennett*, 610 S.W.2d 144, 145 (Tex.1980); *Miller v. Bock Laundry Machine Co.*, 568 S.W.2d 648, 649–50 (Tex. 1977).

The present case is a claim under the Deceptive Trade Practices Act arising from a sale by appellee to appellant of a cash register. Appellee is the owner of Adams Office Machines, which sells and services office machines, including cash registers. Appellant is a family-owned corporation doing business as C & S Beer Barn ("C & S"), a convenience store, selling mostly packaged goods, gasoline, beer, and wine. The day-to-day business is run by Scott Hill. Ninety-nine and nine-tenths percent of all sales are done in cash.

In October of 1984, the Hills began having difficulties with their cash register, an ESPER model; the printer would not legibly print numbers on the tapes. Scott Hill contacted appellee, who stated that he repaired ESPER cash registers. Appellee gave the Hills a "loaner" register to enable them to continue business until the corporation's cash register was repaired. Scott Hill testified that he told appellee that it was critically important to his business to have a functioning cash register. The "loaner" given to appellant was an RC Allen; it was a four department cash register, as opposed to an eighteen department register such as the ESPER. Scott Hill stated that it was of no use to him; the register had insufficient capability with regard to inventory control. Appellee stated it would take several days to repair the ESPER. Scott Hill was told that the RC Allen was a "loaner" given to customers in order for appellee to obtain business.

After discussing new innovations in the industry, appellee sold appellant a new register, an RC Allen 205, for $1,700. Scott Hill testified that Adams represented the register was compatible with appellant's IBM personal computer, and all that was needed to transfer information from their original machine to the new machine was the "hardware"—a wire connecting the two machines. Scott Hill testified that he not have any special knowledge of the operation and functioning of the cash register computer, and that he relied on appellee's expertise in his business.

Upon reading the operator's manual, Hill found that the RC Allen 250 was not compatible with the IBM, which was confirmed by appellee. Appellant did not pay for the RC Allen 250, at the instruction of appellee. The corporation then purchased a second machine from appellee, and RC Allen 540, also represented as IBM compatible at that time; all appellant had to do was purchase the software. The loaner had been picked up by appellee when the first machine purchased was delivered to appellant. No charge was made to appellant for the loaner. Appellant was charged, and paid for the RC Allen 540; the payment was for $2,239.17 and appellant was given a receipt from Adams.

The RC Allen 540 was programmed by appellee's employee, Rick, but was never hooked up to appellant's personal computer. A few days after the computer was installed, appellant was told that the entire

register had to be sent to California in order for a disk to be installed, and that the software would be ready in December. Hill testified that he was not given any of this information prior to paying for the register. In the mean time, the RC Allen 540 was improperly calculating receipts and cash; the Hills had no control over their cash flow. This caused problems with control over the money as well as taxes. The register was reprogrammed at night by Rick.

At this time, the ESPER was still being repaired by appellee; the register was returned to appellant in late December with an invoice for repairs, although the printer on the ESPER had not been repaired.

Appellee sent the same repairman to repair the machine, who told Hill he could not repair the printer. Appellant did not pay the bill; the machine was still under a 90–day warranty, but was never repaired.

The RC Allen 540 printer broke again one day later; appellee ordered a new printer which was not installed for a few days. The printer was replaced three times, but never repaired; no charge was made to appellant. The ribbon on the machine's printer was also repaired. Appellee's repairman, Rick, told Hill that the 540 he purchased from Adams was the worst lemon he had ever seen in his years in the cash register business. Appellant finally bought a new cash register from another company to replace the 540; it is totally compatible with the IBM computer and there have been no problems in using it.

During this time, appellee represented that he serviced the machines he sold, and stood behind all of his work. Adams told Hill that the warranty was with Adams only, and not issued to appellant, who never received a factory warranty. Allen also refused to give appellant the 800 number for RC Allen products, not wanting Hill to have any discussion with the manufacturer. After a number of attempts to repair the 540, appellee told Scott and Claude Hill that it wasn't his problem any longer; he refused to refund appellant's money or pick up the 540 from appellant.

Hill testified that, after attempting to reconcile the tickets, a reasonable estimate of how much cash lost resulting from the accounting procedure ruined by the 540 was probably six or seven hundred dollars. Hill testified that he does not know what a Titan 20/40 machine is, never discussed buying such machine, never bought such a machine from appellee, and was never billed for such a machine.

Ernestine Hill, Scott Hill's mother and bookkeeper for the family business of C & S, testified that Adams represented that the initial machine would perform all functions necessary to their business. She also testified that Adams told them not to pay for the machine because it would not perform the functions as represented by him. She was present when the second machine was bought, and she paid the invoice charge of $2,239.17 for the RC Allen 540. She was aware of the problems with the 540, such as the ribbon cartridge bunching and problems with the printer which persistently occurred for three months, thus removing inventory control necessary to keep the books. She testified that at no time did appellee bill C & S for parts, labor, or anything else with respect to any machine other than the 540, plus the bill appellee instructed her not to pay. She testified that appellant was damaged as a result of the 540 in loss of time, records, and funds which were tied up and could not be utilized. She personally spent five extra hours per day, seven days a week, for three weeks trying to compute the sales. She estimated her time at $10 per hour, which is approximately $1,050. The corporation also had to purchase another register.

Claude Hill, Scott Hill's father, a shareholder of Sun Power testified that he became involved with Adams when Adams told them that the initial RC Allen they bought would not be compatible with the IBM as he had represented to Scott Hill, but that he had a register which was compatible. Claude Hill was told that the new computer would have a package enabling him to hook up the two computers in December. The 540 was installed. The first problem was with the printer, which broke

many times but was never repaired. When the problems with the machine arose, Claude Hill could not balance the cash and the register totals, which caused a great deal of trouble for the business. Claude Hill testified that the 540 machine was never repaired by appellee, and three months after the initial contact with Adams, Claude Hill requested appellee to come pick up his machine and stand behind his promise to take it back if appellant was not completely satisfied; Adams refused. Adams further refused to refund appellant's money. After Adams' refusal to refund the purchase price on the machine, Adams told Claude Hill that the warranty was made to Adams and he did not know where the warranty was.

Claude Hill testified that the Hills had never had a register with the tradename Titan 20/40. He stated that the corporation had been damaged by its money being tied up for two years which was probably worth $3,800; the corporation had bought another machine. He personally spent 79 to 80 hours dealing with the problems caused by the machines; a reasonable hourly rate for his time was $25 per hour, which is approximately $2,000.

John Adams testified that he had previously attempted to get the Hills' business. He had knowledge of the ESPER computer, but not the printer when he took it for repair. Adams testified that he had told the Hills that the RC Allen 250, the first machine delivered to appellant, was IBM compatible. He then delivered the machine to appellant. He realized his mistake in representing what the 205 could accomplish, and took the machine back. He then suggested the RC Allen 540 to Scott Hill, which was purchased.

At trial, Adams gave extended testimony and demonstrations as to the potential problems with the dot matrix on the printer. He testified that he did and did not fix the printer; three printers at $300 a piece were put into the 540, but Adams admitted that RC Allen paid for them. Appellee keeps five dot matrix pins in stock because they break all the time.

Adams major testimony as to the printer constantly breaking was that the Hills or their employees were pulling the paper out of the machine too fast, breaking the pins which print on the paper. Adams later admitted that the problem could be with defective solenoids as opposed to the pins, and that the paper receipt will not feed upward until the pins are finished printing. He also testified that he had approximately six hours training on the 540, of which the printer is a component part.

Adams stated that the ESPER was repaired, but the Hills were still having problems with it. He billed the Hills for labor and service on the ESPER at $155. Adams further testified that he wanted to be paid for the invoice pertaining to the RC 205, billed at $1,779.75, although the invoice was marked "Void" in his own handwriting. He agreed that he told Ernestine Hill not to pay the bill, and only decided to charge the Hills after they filed a claim against him.

Adams testified that he orally warranted the 540 for 90 days; the warranty states that if the machine breaks or is defective, he would fix it. He never gave the Hills the factory warranty, even though he would not return their money.

Adams testified that Scott Hill agreed to trade his RC 540 for a Titan 20/40 because he wanted to get away from the dot matrix printer; Al Gitelman, sales representative for the company who makes the Titan, was present. Adams' employee, Rick, programmed the Titan for appellant. Adams testified that the Titan was a special order, with a fair market price of $1,995. There is no purchase order for the Titan, no sales ticket and no written contract nor memo of Scott Hill ordering the Tital. In comparison, there is a bill for the initial RC 205 which Adams instructed Ernestine Hill not to pay for that register.

Adams holds himself out to be an expert in his field, and expects people to rely upon the advice and statements he makes. He is requesting damages for the Titan 20/40, the RC 205 which was returned and resold at a $700 loss, and for the printers he did not pay for.

Al Gitelman testified that he received a verbal order for a Titan for Scott Hill, but there were no written orders. The machine cost $1,995 retail and is a special order, although there is a regular established market for this register, and it is a very saleable item. Further, the dealers program the computer to the customer's specifications, but they can easily be reprogrammed. It takes ten seconds to return the program to zero, and one hour to reprogram the machine.

Rick Medina, repairman for appellee, testified that he had never dealt with the problem that the Hills had with the 540 appellee sold them. He stated that it was possible that he made a mistake on the last repair, due to a missing calendar chip. He did not know how the pins broke on appellant's machine. Medina had never worked on another 540, nor had he ever programmed that type of register. The only training he had came from Adams, who testified he only had six hours of training himself. Finally, it took Medina eight minutes to change printers on the 540.

In reviewing the jury's finding of unconscionability in special issue number 5, we note that the special issue incorporates the two definitions of "unconscionable" as promulgated by the Texas Supreme Court. See *Chastain v. Koonce*, 700 S.W.2d 579, 583 (Tex.1985). The court further defined the term "gross" within the DTPA as being "given its ordinary meaning of glaringly noticeable, flagrant, complete and unmitigated". *Id.*

The courts have found unconscionability in several cases similar to the case before this court. *Tri–Continental Leasing v. Law Office*, 710 S.W.2d 604, 607 (Tex.App. —Houston [1st Dist.] 1985, writ ref'd n.r.e.) (salesman in a superior position of knowledge had taken advantage of lessee to a grossly unfair degree by representing that a copy machine would perform its intended function); *Mercedes–Benz of North America v. Dickenson*, 720 S.W.2d 844, 855–56 (Tex.App.—Fort Worth 1986, no writ) (court found unconscionable course of action by failing to provide proper replacement parts, supported by evidence of re-

peated unsuccessful attempts to provide such parts, resulting in a gross disparity between value paid and value received); *Town East Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 807 (Tex.App.—Dallas 1987, no writ) (unconscionable conduct on the part of automobile salesman, supported by sufficient evidence showing seller refused buyer's demand to rescind purchase, even after repeated attempts to repair car had failed).

▮ We find that the jury could have reasonably determined that either appellee took advantage of appellant to a grossly unfair degree or that there was a gross disparity in the value received and the consideration paid. Therefore, with reference to special issue number 5, appellant's first and second points of error are sustained. Appellant is entitled to $700 in actual damages awarded by the jury. Further, it is mandatory under section 17.50(a) that the trial court, upon an award of actual damages, award two times that portion of actual damages that does not exceed $1,000. Therefore, appellant is entitled to its actual damages multiplied by two equalling $1,400; added together, appellant's recovery equals $2,100.

▮ In its motion for judgment on the verdict, appellant prayed for prejudgment interest. Where damages are established as of a definite time and the amount thereof definitely determinable, interest is recoverable as a matter of right from the date of injury or loss. *Building Concepts, Inc. v. Duncan*, 667 S.W.2d 897, 902 (Tex.App.— Houston [14th Dist.] 1984, writ ref'd n.r.e.). In the present case, the award of damages was upon a finding of unconscionability under section 17.50 of the DTPA. In reviewing the record, there is only one instance in which the specific amount of $700 is mentioned. Scott Hill testified as follows:

Q. Is there any way you can give this jury a reasonable estimate of how much cash that you have lost in the accounting procedure that was fouled up?

A. My accountant would love the answer to that. Oh, probably six or seven hundred dollars' worth of cash that is just—

Q. Disappeared?

A. Disappeared, that there is no idea where it is or, you know, how it got where it is. So that is—that is really just a ball park figure, too.

The damages were not established relating to any definite time period. We therefore hold that appellant is not entitled to prejudgment interest. *See Tom Benson Chevrolet, Inc. v. Alvarado*, 636 S.W.2d 815, 824 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.); *compare Quintero v. Jim Walter Homes, Inc.*, 709 S.W.2d 225 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.).

■ The conditioning of special issue number 10 required an affirmative answer to special issue number 1, 3, 4, or 5. Only special issue number 5 was answered affirmatively. In that special issue, the jury found that appellee's conduct was *unconscionable*, not that he acted knowingly, which was the prerequisite to recovunder special issue number 10. Therefore, it was improper for the jury to award damages under that issue.

It is also important to note that the third sentence in section 17.50(b)(1) provides for an additional award of not more than three times the amount of actual damages *in excess of $1,000.* There are no damages in excess of $1,000 and therefore, the award is improper. With regards to the allegations pertaining to special issue number 10, appellant's first and second points of error are overruled.

In its third and fourth points of error, appellant contends the trial court erred in rendering judgment for appellee due to failure to plead the affirmative defense of accord and satisfaction, and in overruling appellant's objection to the charge calling attention to appellant's defective pleadings. *See* TEX.R.CIV.P. 94. Appellee's first amended answer and counterclaim alleges that defendant ordered another register, the Titan 20/40, to replace the RC Allen 540; that the Titan was programmed for appellant's use; and that appellant refused to accept the Titan when delivered. Adams testified that he suffered $700 in lost profits upon resale of the register. Appellee put on evidence pertaining to the Titan, after Scott Hill testified that he knew nothing at all about that register.

■ Accord and satisfaction is an affirmative defense which must be specifically pleaded. *Fortner v. Merrill Lynch, Pierce, Etc.*, 687 S.W.2d 8, 13 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). Unless there is a trial by consent, it is improper for a trial court to submit or render judgment on such a defense absent the necessary pleadings. *Hays Cons. Ind. Sch. D. v. Valero Trans. Co.*, 645 S.W.2d 542, 547 (Tex.App.—Austin 1982, writ ref'd n.r.e.); *see also Tanenbaum Textile Co. v. Sidran*, 423 S.W.2d 635, 638 (Tex.Civ.App.—Dallas 1967, writ ref'd n.r.e.); TEX.R.CIV.P. 301.

■ We do not believe the issue of accord and satisfaction was tried by consent. The doctrine of implied consent applies only in exceptional cases in which it clearly appears from the record as a whole that the issue was actually tried, although not pleaded. *Jay Fikes and Associates v. Walton*, 578 S.W.2d 885, 889 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.). In cases where testimony is relevant to an issue pleaded as well as one not pleaded, the doctrine should not be applied unless clearly warranted. *Wendell v. Central Power and Light Co.*, 677 S.W.2d 610, 619 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.); *Watts v. Watts*, 563 S.W.2d 314, 316 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.). In the case at bar, the evidence of the Titan 20/40 was relevant to the other allegations of deceptive trade practices and failure of consideration.

Appellee alleges that appellant waived the right to challenge the legal or factual sufficiency of the jury answers by filing a motion for judgment on the verdict; more specifically, that a motion for judgment on the verdict amounts to an affirmation that the jury findings were supported by the evidence. *See Russell v. Dunn Equipment, Inc.*, 712 S.W.2d 542 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). Appellee fails to note that the jury issues complained of were not part of appellant's motion on the verdict. Appellant requested judgment on actual damages found by the

jury, interest and mandatory statutory damages. Because of the dispute between the parties on the correct interpretation of the jury findings, we cannot agree with appellee's contention of trial by consent. *See Miner–Dederick Const. Corp. v. Mid–Cty. Rental,* 603 S.W.2d 193, 198 (Tex. 1980). Appellant's motion for judgment was consistent with its posture here and at trial; therefore, there has been no waiver as to accord and satisfaction. *See Litton Indus. Products, Inc. v. Gammage,* 668 S.W.2d 319, 322 (Tex.1984).

A judgment must correspond to the issues raised by the pleadings, the nature of the case proved and the verdict. *Texaco, Inc. v. Wolfe,* 601 S.W.2d 737, 741 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). Because there are no pleadings to support appellee's allegations of accord and satisfaction, and in absence of trial by consent, we sustain appellant's third and fourth points of error. In answer to the special issues pertaining to the Titan 20/40 register, the jury refused to award damages to appellee and, therefore, no harm was done.

The judgment of the trial court improperly consisted, in major portion, of a trial brief or memoranda. It is improper for these items to be within the transcript on appeal. *Litton,* 668 S.W.2d at 322. Embodying a memorandum in the judgment was not only improper, but a detriment to the proper analysis of the case at bar. We caution and ask trial judges to guard against such occurrances.

The judgment of the trial court is reversed and rendered. Appellant is entitled to actual damages of $700, multiplied by two equaling $1,400. Added to the initial $700, appellant is entitled to recover $2,100. By stipulation of the parties, appellant is awarded $9,000 in attorney's fees, consisting of $7,000 for the initial trial and $2,000 for appeal to this court.

### OPINION ON REHEARING

Appellant's motion for rehearing is hereby granted. The opinion of this court will stand, with only the judgment being reformed.

In reversing the trial court's judgment and rendering judgment for Sun Power, we did not provide for post-judgment interest. When a trial court's judgment is erroneous the judgment of the court of appeals must take its place, and appellant is entitled to interest from the date of the erroneous judgment. *See Thornal v. Cargill, Inc.,* 587 S.W.2d 384, 384–85 (Tex. 1979). Sun Power is entitled to post-judgment interest at ten percent, Office of Consumer Credit Commissioner, 11 Tex.Reg. 4223 (1986), from the date of the trial court's judgment, October 22, 1986.

We therefore reform the judgment of this court to read as follows:

This cause came on to be heard on the transcript of the record and the same having been reviewed it is the opinion of the Court that there was error in the judgment of the trial court. The judgment of the trial court is reversed and is rendered that appellant is entitled to actual damages of $700.00, multiplied by two equaling $1,400.00, the sum being $2,100.00. By stipulation of the parties, appellant is awarded $9,000.00 in attorney's fees, consisting of $7,000.00 for the initial trial and $2,000.00 for appeal to this court. Appellant is entitled to post-judgment interest at the rate of 10% per annum from the date of the trial court's judgment, signed October 22, 1986.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the appellant recover of the appellee the sum of $11,100 together with interest at the rate of 10% per annum from October 22, 1986, until paid.

It is further ordered that appellee, John Adams, d/b/a Adams Office Machines, pay all costs in this behalf expended, for which let execution issue, and that this decision be certified below for observance.